NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230351-U

NO. 4-23-0351

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| TARA S., | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Adams County |
| CHRISTINA COX, | ) | No. 22OP407 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court reversed, concluding a plenary stalking no contact order should not have been issued where the evidence failed to show respondent knew or should have known her course of conduct would cause a person in petitioner's circumstances with petitioner's knowledge of respondent and respondent's prior acts to fear for her safety or the safety of her child or suffer significant mental suffering, anxiety, or alarm.

¶ 2    Pursuant to the Stalking No Contact Order Act (Act) (740 ILCS 21/1 to 135 (West 2022)), petitioner, Tara S., filed a petition for a stalking no contact order against respondent, Christina Cox. The circuit court entered the requested order on an emergency basis and then, following a hearing, entered the order on a plenary basis to expire one year from the date of entry of the emergency order. Respondent appeals, arguing the plenary order should not have been issued based upon the evidence presented. For the reasons that follow, we agree and reverse the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                      A. Petition for a Stalking No Contact Order

¶ 5        In October 2022, petitioner, proceeding *pro se*, filed a verified petition for a stalking no contact order against respondent. In the petition, petitioner alleged respondent, the former foster mother of one of petitioner's children, K.S., continued to contact her and K.S. after she "regained custody" of K.S. in July 2022. Specifically, petitioner alleged respondent (1) repeatedly contacted her via "[p]hone" and "text message" and (2) sent K.S. a letter at her school requesting continued communication. With respect to the contact via text message, petitioner alleged she received messages on July 5, 14, 22, 27, and 29; August 3; and September 18 and 24. Petitioner further alleged the contact occurred despite representatives from involved agencies addressing the issue with respondent and the existence of a "fostering contract" stating respondent was to have no contact with petitioner or K.S. after K.S. was returned to petitioner's care. Petitioner requested the stalking no contact order be entered in favor of herself and K.S.

¶ 6                          B. Issuance of an Emergency Order

¶ 7        Also in October 2022, the circuit court, Judge Amy C. Lannerd presiding, conducted a hearing on the petition for a stalking no contact order. Petitioner appeared *pro se*, while respondent, who had not been served with the petition, did not appear. A representative from the Quincy Area Network Against Domestic Abuse (Quanada) was also present at the hearing. On inquiry of the court, petitioner testified the allegations in her petition were true, correct, and accurate. When asked for a brief explanation why she was requesting a stalking no contact order, petitioner testified:

> "[K.S.] did really good [when temporarily placed with respondent]. [K.S.] was to
> be returned to me July 4th of this year and she was. Prior from July 4th, [respondent]

- 2 -

was given notice from four agencies that, for the best interest of [K.S.], that she would leave me and [K.S.] alone. It was verbal. She won't do it. She is now in the public school system and this lady has—she's a principal in a different school district. They are now sending letters through third parties to [K.S.] in a different school district. We can't get any authority to get her to understand it."

The court, based upon the evidence presented, entered the requested stalking no contact order on an emergency basis. Thereafter, respondent was served with the petition and emergency order and obtained representation by counsel. The matter was then continued until March 2023.

¶ 8                                    C. Issuance of a Plenary Order

¶ 9        In March 2023, the circuit court, Judge John C. Wooleyhan presiding, conducted a hearing on the petition for a stalking no contact order. Petitioner appeared *pro se*, while respondent appeared with counsel.

¶ 10                                    1. *Petitioner's Case*

¶ 11       Petitioner presented testimony from multiple witnesses, including herself, her therapist, and involved caseworkers. The following is gleaned from the testimony presented.

¶ 12       In early 2022, K.S. was in the temporary care of respondent, her foster mother. Petitioner was unaware of how long K.S. had been in respondent's care. Around July 2022, K.S. was returned to the care of petitioner. The court case which brought K.S. into temporary care was closed on October 5, 2022, the same day petitioner sought a stalking no contact order against respondent.

¶ 13       With respect to the verified petition filed in this case, petitioner testified she relied upon the assistance of a representative from Quanada to complete the petition. As for the allegation about a "fostering contract" in the petition, petitioner asserted she knew "nothing about that." As

- 3 -

for the allegation about respondent sending a letter to K.S., petitioner asserted "someone misinterpreted what was said." Petitioner acknowledged the letter, which was the subject of the allegation, was not, in fact, sent to K.S. by respondent.

¶ 14 Petitioner testified respondent continued to contact her after K.S. was returned to her care. Specifically, petitioner asserted she "kept getting phone calls and text messages from [respondent]." Petitioner indicated she received "five to eight of them all pertaining to [K.S.]." The text messages, she explained, concerned "asking about seeing [K.S.], how they miss [K.S.], how they want to be involved with her." Petitioner acknowledged the text messages never contained any "threats." She asserted the continued contact from respondent "was making [her] mental [health] bad" and "stressed [her]."

¶ 15 Petitioner testified she had wanted "no communication whatsoever" from respondent after K.S. was returned to her care and was "under the understanding that there would be no [such] communication." She acknowledged she never directly conveyed to respondent that the contact should be halted. Petitioner testified she never responded to respondent's phone calls or text messages; however, she also acknowledged communicating with respondent about a bracelet K.S. had left in respondent's home, as well as K.S. being involved in a dance program. Petitioner asserted she spoke with the involved caseworkers and her therapist about her desire for the contact by respondent to be halted and then relied upon those individuals to convey her desire to respondent.

¶ 16 Petitioner's therapist testified she contacted involved caseworkers about respondent's continued contact with petitioner. One of the caseworkers, according to petitioner's therapist and over no objection, indicated in response, "[T]hey had conversations before and that she would take care of it again." The caseworker also reportedly indicated respondent would not

be "reaching out" to the petitioner further. Petitioner's therapist did not recall when the caseworker had given these responses.

¶ 17　　　　The caseworker whom petitioner's therapist spoke with testified she spoke with respondent and conveyed "that it would not be in the best interest of [K.S.] specifically to have in-person visitation." The caseworker indicated respondent was upset but agreed she would not reach out for in-person contact. The caseworker acknowledged petitioner had conveyed to her instances where respondent "reach[ed] out" and made "inquiries" about K.S.'s well-being. The caseworker was not aware of any "threats or nasty messages" from respondent. The caseworker testified she and respondent did not discuss "texting and calling." The caseworker acknowledged the parties had difficulties "get[ting] along" while the case which brought K.S. into care was ongoing.

¶ 18　　　　Another caseworker recalled a conversation with petitioner around August or September 2022 about petitioner wanting contact by respondent to halt. The caseworker observed text messages on petitioner's phone. The caseworker indicated the text messages were primarily "just concerns about [K.S.]," such as asking "how [K.S.] was" and if there was "anything they needed." The caseworker did not see any threatening messages. The caseworker advised petitioner he would talk to his supervisor about the unwanted contact, which he then did. The caseworker testified he also advised petitioner to tell respondent to stop contacting her. The caseworker never spoke with respondent about the unwanted contact. Later, in October 2022, the caseworker advised petitioner to seek a no contact order if the contact was still occurring.

¶ 19　　　　　　　　　　　2. *Motion for a Directed Finding*

¶ 20　　　　At the close of petitioner's case, respondent moved for a directed finding. The circuit court denied respondent's motion.

¶ 21                                    3. *Respondent's Case*

¶ 22          Respondent presented testimony from multiple witnesses, including herself, her sister, a former teacher of K.S., the director of an involved agency, a caseworker, and a teacher at K.S.'s current school. Respondent also presented the letter sent to K.S. which was the subject of the allegation in the petition, as well as screenshots of multiple text messages sent between the parties. The following is gleaned from the evidence presented.

¶ 23          Respondent, a school principal and an experienced foster parent, testified K.S. came into her temporary care on June 6, 2021, and then lived with her through July 13, 2022.

¶ 24          With respect to the allegations in the verified petition, respondent testified she never sent a letter to K.S. after K.S. was returned to the care of petitioner. She also testified she was not aware of any fostering contract indicating she was to have no contact with petitioner or K.S. after K.S.'s return. The contents of the letter sent to K.S., as well as the testimony from other witnesses, confirmed respondent had no involvement in its drafting or transfer. Testimony from the director of an involved agency confirmed the absence of any fostering contract indicating respondent was to have no contact with petitioner or K.S. after K.S.'s return to the care of petitioner.

¶ 25          Respondent acknowledged continued contact with petitioner after K.S. was returned to  petitioner's care. Respondent asserted said contact was encouraged by a caseworker to provide additional support for K.S. That caseworker testified and indicated she told petitioner during the summer of 2022 "that communication between [K.S.] and the foster parents would be beneficial to [K.S.] [as well as ] the rest of the family as *** extra support." The caseworker further indicated petitioner did not express any opposition to this suggestion at the time. The caseworker also testified about an instance where she, in response  to an inquiry from petitioner's therapist, informed petitioner's therapist "[t]hat it would be beneficial for [K.S.] to still have that

communication" with respondent. The caseworker testified she never told respondent that her contact with petitioner should be halted.

¶ 26      Respondent testified about text messages she sent to petitioner between July and September 2022. Respondent took screenshots of the text messages sent and received on or about the dates listed in the verified petition. On July 5, respondent sent petitioner a message about an appointment for K.S., to which petitioner responded. On July 14, petitioner sent respondent a message about a missing bracelet, to which respondent responded and a lengthy discussion occurred. On July 22, 27, and 29, respondent sent petitioner messages, to which petitioner did not respond. The first two messages concerned respondent "checking in" on K.S. The last message concerned respondent sharing information about a dance class for K.S. and offering to provide both funds and transportation for the class.

¶ 27      In late August or early September 2022, respondent contacted a caseworker about the absence of any recent communication from petitioner. Respondent testified the caseworker advised against in-person contact with K.S. due to an incident which occurred during the last overnight visit K.S. had with respondent. Respondent further testified the caseworker stated she hoped they could have in-person contact in the future. On September 18 and 24, respondent sent petitioner text messages, to which petitioner did not respond. In the first message, respondent conveyed a desire to be involved in K.S.'s life and again made the offer concerning the dance class. In the second message, respondent conveyed that a picture K.S. had drawn was in the news. Respondent testified she was never told to have no further contact with petitioner following K.S.'s return to petitioner's care.

¶ 28                        4. *Circuit Court's Decision and Order*

¶ 29      Following arguments, the circuit ruled as follows:

"The record in this case shows that the petition was filed by [petitioner] on behalf of herself and also showed [K.S.] as another protected person because [K.S.] is a part of the household of [petitioner]. The—based on the evidence, the Court can find it does have jurisdiction over the parties and the subject matter. The Court has been able to review the exhibits that have been brought into court today and also observe all the witnesses who testified and to determine the weight and credibility to be assigned to each of them.

There are some statements, parts of the statement in the petition have been proven. Others have not. It doesn't really revolve around the—whether the child was in foster care or not. That really doesn't help determine the issues. That was part of what the circumstances were but the way that stalking is defined under the statute is it refers to a course of conduct, not one single thing. Not one single act. Stalking does include certain things which are listed in the statute such as following someone from place to place or keeping someone under surveillance, going to a person's home or place of work. It also includes stalking behavior does include making unwanted telephone calls, sending unwanted emails, or text messages along with other behavior.

In this situation, it has been proven that [the petitioner] did receive text messages from the respondent on several occasions that she had not solicited. They came from the respondent to the petitioner regarding the minor child that's been referred to in this case and some of those text messages came after the child was back living with the petitioner, the mother.

Under the statute, there is—there is no requirement listed in the statute that

someone has to inform another party to say that they don't want to be contacted by that person. Those contacts don't—do not have to contain threats of any kind to be considered stalking if the communication is something that's unwanted or unsolicited and that's really as far as we have to look here. The petitioner received unwanted communications from the respondent and based on that and the exhibits and all the information that it would constitute a course of conduct or a series of events that would constitute stalking so there's been a sufficient amount of proof offered on some of these allegations in the petition to say that or find that the petition has been proven by the evidence and would be a basis for continuing the stalking no-contact order in place."

The court entered a plenary stalking no contact order. The order was set to expire on October 6, 2023.

¶ 30        This appeal followed.

¶ 31                              II. ANALYSIS

¶ 32        On appeal, respondent argues the plenary stalking no contact order should not have been issued based upon the evidence presented. Specifically, respondent argues the circuit court's failure to properly apply the requirements of the Act resulted in it erroneously denying her motion for a directed finding at the close of petitioner's case and issuing the plenary order.

¶ 33                         A. Lack of an Appellee Brief

¶ 34        Petitioner has not filed an appellee brief. Nevertheless, the record on appeal is simple and the claimed error is such that this court can easily decide it without the aid of an appellee's brief. Accordingly, we will proceed to the merits of this appeal. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976).

¶ 35                                    B. Mootness

¶ 36        Before reaching the merits of this appeal, we must consider the matter of mootness, a matter which we note was not addressed by respondent despite the likelihood the plenary order would expire before this appeal could be resolved. "An appeal is moot when the issues involved in the [circuit] court no longer exist because intervening events have made it impossible for the reviewing court to grant the complaining party effectual relief." *In re Benny M.*, 2017 IL 120133, ¶ 17, 104 N.E.3d 313. Even assuming the expiration of the plenary order rendered this appeal formally moot, we find the issue presented is reviewable under the public interest exception to the mootness doctrine. "The public interest exception applies when (1) the question presented is of a public nature, (2) there is a need for an authoritative determination for the future guidance of public officers, and (3) there is a likelihood of future recurrence of the question." *In re Lance H.*, 2014 IL 114899, ¶ 13, 25 N.E.3d 511. Here, it is of public interest that the underlying purpose of the Act, which is to address the societal problem of stalking (740 ILCS 21/5 (West 2022)), be achieved. This can only be done by courts properly applying the requirements of the Act. See *Whitten v. Whitten*, 292 Ill. App. 3d 780, 784, 686 N.E.2d 19, 22 (1997). Guidance on this issue would, furthermore, be beneficial for future litigation under the Act.

¶ 37                            C. The Circuit Court's Judgment

¶ 38        On the merits, respondent argues the circuit court's failure to properly apply the requirements of the Act resulted in it erroneously denying her motion for a directed finding at the close of petitioner's case and issuing the plenary order.

¶ 39        We initially decline to consider petitioner's argument to the extent it attacks the circuit court's ruling on her motion for a directed finding. As respondent acknowledges on appeal, she moved a directed finding at the close of petitioner's case pursuant to section 2-1110 of the

Code of Civil Procedure (735 ILCS 5/2-1110 (West 2022)). Section 2-1110 states: "If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived." *Id.* Because respondent adduced evidence in support of her defense following the denial of her motion, she has "waived" any issue with the court's ruling on the motion. See, *e.g.*, *Dwyer v. Love*, 346 Ill. App. 3d 734, 737-38, 805 N.E.2d 719, 722-23 (2004) (applying section 2-1110's waiver provision).

¶ 40        We will, however, consider respondent's argument to the extent it attacks the ultimate issuance of the plenary order. Among other things, respondent argues the circuit court failed to properly consider the requisite mental state set forth in the Act before finding she had committed an act of stalking.

¶ 41        Under the Act, a victim of stalking may commence a civil proceeding seeking an order barring the stalker from making any further contact. 740 ILCS 21/5, 15 (West 2022). A circuit court must issue a stalking no contact order where the petitioner proves by a preponderance of the evidence the respondent engaged in an act of stalking. *Id.* §§ 30, 80. The decision to issue a stalking no contact order will generally not be reversed on appeal unless it is against the manifest weight of the evidence. *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12, 36 N.E.3d 344.

¶ 42        The Act defines " 'Stalking' " as "[(1)] engaging in a course of conduct directed at a specific person, and [(2)] he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety, the safety of a workplace, school, or place of worship, or the safety of a third person or suffer emotional distress." 740 ILCS 21/10 (West 2022). With respect to the latter, the Act further defines " '[r]easonable person,' " as "a person in the petitioner's circumstances with the petitioner's knowledge of the respondent and the

respondent's prior acts." *Id*. The Act also defines " '[e]motional distress' " as "significant mental suffering, anxiety or alarm." *Id.*

¶ 43 After reviewing the circuit court's ruling, the pertinent definitions provided in the Act, and the evidence presented, we are left with the conclusion the court failed to properly consider the requisite mental state before finding respondent had committed an act of stalking. In its ruling, the court did not address the pertinent definitions. As they apply here, petitioner had to prove by a preponderance of the evidence respondent knew or should have known her continued contact would cause a person in petitioner's circumstances with petitioner's knowledge of respondent and respondent's prior acts to fear for her safety or the safety of K.S. or suffer significant mental suffering, anxiety, or alarm.

¶ 44 We find the evidence presented could not have satisfied petitioner's burden, and any finding to the contrary would be against the manifest weight of the evidence. The evidence showed, shortly before K.S. was returned to petitioner's care, the parties were encouraged to maintain contact with each other. Respondent testified she was, with the exception of in-person contact, never told otherwise. The initial complained-of contact was reciprocated by petitioner. The continued complained-of contact, although not reciprocated, concerned K.S.'s well-being. It was neither threatening, intimidating, harassing, nor incessant.

¶ 45 While petitioner presented testimony over no objection suggesting respondent continued to contact her despite having knowledge of petitioner's desire for the contact to halt, that testimony was ambiguous and hearsay. Petitioner also presented testimony indicating the parties had difficulty getting along while the case involving K.S. was ongoing. This testimony, by itself, is insufficient to show respondent knew or should have known her continued contact about K.S.'s well-being would cause a person in petitioner's circumstances with petitioner's knowledge

of respondent and respondent's prior acts to fear for her safety or the safety of K.S. or suffer significant mental suffering, anxiety, or alarm.

¶ 46      Upon properly considering the requisite mental state, it is evident petitioner has failed to show respondent committed an act of stalking as it is defined by the Act. Accordingly, the plenary stalking no contact order should not have been issued, and the circuit court's judgment must be reversed.

¶ 47                                III. CONCLUSION

¶ 48      We reverse the circuit court's judgment.

¶ 49      Reversed.